UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\---------------------------------------------------------x

BLAIR GARNER,

                          Petitioner,

         - against -

WILILAM LEE, SUPERINTENDENT OF
GREENHAVEN CORRECTIONAL
FACILITY,

                          Respondent.

\---------------------------------------------------------x

**MEMORANDUM & ORDER**
2:11-CV-00007 (PKC)

PAMELA K. CHEN, United States District Judge:

Petitioner Blair Garner ("Petitioner" or "Garner") petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C § 2254, challenging his conviction, following a jury trial in Supreme Court, Suffolk County, of murder in the second degree, assault in the first degree, robbery in the first degree, criminal use of a firearm in the first degree, and criminal possession of a weapon in the second degree, all arising out of a non-fatal shooting on April 13, 2002. In his petition, Garner contends, *inter alia*, that he was denied effective assistance of counsel based on his trial counsel's failure to obtain Garner's cellphone records, which detail calls made to and from that cellphone on the night of the shooting.[1] (Dkt. 1.) For the reasons set forth below, the petition is GRANTED.

---

[1] In addition to his ineffective assistance claim, Petitioner also asserts that he was denied a fair trial when the trial court refused to grant a motion for mistrial upon discovering two jurors' potential exposure to a relevant newspaper article. However, as discussed below, because the Court grants the petition on the grounds of ineffective assistance of counsel, it need not address the other bases for the petition.

**BACKGROUND**

## I.      TRIAL EVIDENCE AND PROCEEDINGS

The evidence presented at trial, which commenced on October 17, 2002, established that on April 13, 2002, Petitioner shot Karl Keith ("Keith") from behind, as Keith was about to engage in a drug transaction.  (*See* State Court Trial Transcript ("Tr.") at 1, 501-03.)  Following a jury trial before Suffolk County Court Judge Martin J. Kerins, a jury found Petitioner guilty of attempted murder in the second degree (Count One), assault in the first degree (Count Two), robbery in the first degree (Count Three), criminal use of a firearm (Count Four), and criminal possession of a weapon in the second degree (Count Five).  (Tr. at 945-46.)  At a resentencing, Judge Kerins sentenced Petitioner to concurrent terms of imprisonment totaling 25 years, to be followed by a period of post-release supervision of five years.  (Resentencing Transcript at 18-20.)[2]  Keith and Petitioner provided the key trial testimony, which the Court summarizes in turn.

### A.      Karl Keith's Testimony

At the time of trial, Keith had known Petitioner for approximately a year-and-a-half.  (Tr. at 464.)  On April 11, 2002, two days before the shooting, Keith had contacted Petitioner about purchasing 2,000 pills of ecstasy and two ounces of cocaine for Keith's second cousin, Jesse Merkelson.  (Tr. at 469.)  Keith was also interested in purchasing cocaine to sell himself.  (*See* Tr. at 467.)  The proposed drug transaction was to cost $9,700.  (Tr. at 470.)

On the evening of April 13, 2002, Keith, Merkelson, Merkelson's friend Ryan Palmera, and Petitioner met at a McDonald's in Roosevelt, New York.[3]  (Tr. at 477-78.)  Upon arriving,

---

[2] The reason for Petitioner's resentencing is not relevant to the instant *habeas* petition.

[3] Roosevelt is a village in the town of Hempstead on Long Island, New York.  *See* Roosevelt Union Free School District, http://rooseveltufsd.org/Page/165 (last viewed on 12/08/16).

2

Petitioner pulled his car into the parking spot next to Keith's car. (Tr. at 478.) Keith got out of his car and got into Petitioner's car. (Tr. at 479.) As Merkelson began to approach Petitioner's car, Petitioner told Keith that "it would be a better idea" if Keith and Petitioner went alone— without Merkelson—for the drug transaction. (*Id.*) Petitioner then told Keith that he wanted to return home to change out of his business suit and put on different clothes, so he asked Keith to meet him at a Home Depot in Freeport, New York. (*Id.*) Keith, Merkelson, and Ryan subsequently drove to meet Petitioner at the Home Depot, while Petitioner went home to change. (Tr. at 483.)

Upon arriving at the Home Depot, Keith walked over to Petitioner's car and got into the front passenger seat. (Tr. at 484-85.) Together, the two left the parking lot and drove to North Amityville, where Keith was supposed to test the ecstasy. (Tr. at 484-85, 488.) During the approximately 20-minute drive, Keith neither saw nor heard Petitioner speak on the phone. (Tr. at 486.) He also never heard Petitioner's phone ring. (*Id.*) After arriving at the drug transaction location in North Amityville, Keith put the cash for the transaction in the glove compartment of Petitioner's car. (Tr. at 489.)

Keith and Petitioner exited the car and began walking toward the rear of it. (Tr. at 501.) At that point, Keith lost sight of Petitioner. (*Id.*) After a slight hesitation, Keith turned around and was suddenly shot in the back of his right ear. (Tr. at 502.) Keith then heard Petitioner whisper "Yo, Dread, Yo." (Tr. at 508.) Afraid of getting shot again, Keith closed his eyes and acted as if he was dead. (*Id.*) Sometime later, a police officer arrived at the scene and asked Keith to describe what happened. (Tr. at 509-10.) At that moment, Keith noticed his cellphone ringing with the name "Blizzie," a nickname for Petitioner, displayed on the Caller ID. (Tr. at 512-13.) When the

officer showed the phone to Keith, Keith said: "Don't answer it.  That's the person that just shot me."  (Tr. at 512.)[4]

### B.    Petitioner's Testimony on Direct Examination

Petitioner's affirmative case consisted solely of his own testimony, which differed greatly from Keith's testimony with respect to the events that occurred on the night of the shooting.

Petitioner testified that at the McDonald's, Keith left the cash for the transaction in Petitioner's glove compartment and told Petitioner that he (Keith) was going with Merkelson—not Petitioner—to meet the drug supplier in Freeport.  (Tr. at 793.)  Keith then said that he would call Petitioner later that night for the cash if everything checked out.  (*Id.*)  Petitioner explained that he went home, and Keith and Merkelson went to the site of the drug transaction without him.  (Tr. at 793-94.)  Although no one was home when he initially arrived, Garner's wife and children eventually came home, and he spent time with them while he waited.  (Tr. at 794-95.)[5]  Later that night, after not hearing from Keith, Garner used the radio and alerts features of his phone to try to contact him.  (Tr. at 795.)[6]  Keith did not respond.  (*Id.*)  The next day, while at work, Petitioner was arrested.  (Tr. at 798.) [7]

---

[4] The officer who arrived on the scene, Officer Brian Gover, corroborated this testimony.  (Tr. at 316.)

[5] Neither Petitioner's wife nor his children testified at trial.

[6] These features permit an individual to send an alarm to another individual without speaking on the phone.  (Tr. at 795.)

[7] In addition to Keith, the State also presented testimony from Merkelson, four detectives, two Suffolk County Police Department ("SCPD") officers, and one 911 operator, all of whom, except Merkelson, testified as to the timeline of events after the shooting.  The jury also heard from the surgeon who operated on Keith's gunshot wound, a forensic scientist from SCPD's firearms unit, and a physician's assistant, who was also Keith's father.

### C. Cross-Examination of Petitioner

The prosecution's cross-examination of Petitioner serves as the basis for most of Petitioner's *habeas* petition. Certain pre-trial proceedings are relevant to Petitioner's arguments regarding that cross-examination.

#### 1. Pre-Trial Proceedings

After jury selection, Petitioner's trial counsel raised an issue with the Court regarding the prosecution's apparent intent to introduce Petitioner's Nextel cellphone records. (Tr. at 233.) As Petitioner's counsel explained:

> Your Honor . . . I received the *Rosario*[8] material after the jury was selected yesterday. And in reviewing those materials I had noticed that there are no Nextel records that I would be entitled to prior to opening.
>
> If you take a look at the witness list that the People intend to call, there's a witness, Nextel custodian of records. My understanding is that individual would be used to lay foundation to introduce telephone records for calls that were made through a cellular phone where there was conversations and phone calls made between my client and either a detective or Karl Keith in this case during 10:40 through 11 o'clock the evening that he was shot.
>
> Clearly, under the *Rosario* rules, I am entitled to that. I've asked [the prosecutor] this morning for that. She indicated to me she does not have them, even though they were subpoenaed.
>
> *I will not open without reviewing those records. In the first sense, I'm entitled to it. And should the People not call that witness, I certainly have standing to have those records before I open.*

(Tr. at 233-234 (emphasis added).)

---

[8] In *People v. Rosario*, the New York Court of Appeals held "that a right sense of justice entitles the defense to examine a witness' prior statement, whether or not it varies from his testimony on the stand." 173 N.E.2d 881, 883 (N.Y. 1961).

In response, the prosecution informed the court that they had not yet received the cellphone records, but in any event, had "no objection" to "not putting those records into evidence." (Tr. at 237.)[9] After the prosecution made this representation, Petitioner's counsel dropped the issue and did not persist in his request to obtain the cellphone records, notwithstanding his contention that he was entitled to the records even if the prosecution was not going to admit them. The Court did not rule on trial counsel's objection presumably because it appeared that Petitioner's counsel had withdrawn it.

2.    Impeachment of Petitioner with the Cellphone Records

The prosecution's cross-examination of Petitioner focused on his alibi claim, namely, that he was at home at the time Keith was shot. Despite defense counsel's earlier request for Petitioner's cellphone records and the prosecution's representation that they did not have them, the State moved to admit Petitioner's cellphone records on cross-examination. (Tr. at 817-20.) Petitioner's counsel requested to see the records briefly, stating that he did not "believe [he would] have any objection" to their admission. (Tr. at 818.) Though not having seen them up until that point, after a short review, he indicated that he had no objections. (Tr. at 819.)

The prosecution questioned Petitioner about various entries in his cellphone records. Most devastating were the entries that showed calls from Petitioner's cellphone to his home on April 12, 2002 at 10:20 p.m. and 10:28 p.m.—right about the time when Petitioner testified that he was at home. (Tr. at 819-21.)

---

[9] As further explained below, Petitioner submitted an affidavit in support his State court motion pursuant to New York Criminal Procedure Law § 440.10 ("Section 440 Motion"), attesting to the fact that prior to trial, he had asked his attorney to obtain his cellphone records for April 12, 2002. (Dkt. 9-2 at ECF 36.) Petitioner's counsel, however, did not request nor subpoena the phone records from the phone company. (*Id.*) Rather, according to Petitioner, his counsel requested that Petitioner ask his mother for the records because she was the account holder at the time. (*Id.*) Petitioner's mother requested the records, but they did not arrive until after the trial. (*Id.*)

The prosecution capitalized on this evidence in its summation:

10:06 was the last call recorded on the defendant's Nextel. 10:28 was the next call. Isn't that interesting? And where does he call at 10:28? His home. His home. After he told you that he was certain he got home between 9:45 and ten o'clock and never left again.

Well, who is he calling? Is he calling himself? Did he take out his Nextel and call himself? Well, perhaps he picked up the phone next to the bed, the phone he told you that his wife picked up when they were called by the police, and maybe he called himself. . . .

Does that make sense? Ask yourselves. Does that make sense? Does that ring true? Does any of that make sense?

(Tr. at 874-75.)

## II. SUBSEQUENT PROCEDURAL HISTORY

### A. Post-Trial Investigation

After the trial, Newsday published an article featuring post-trial statements of jurors from Petitioner's trial. (Dkt. 10-2 at ECF 76-77.) The article specifically discussed the jurors' reaction to the prosecution's use of Petitioner's cellphone records to undermine his claimed alibi. (*Id.* at ECF 77.) One juror stated that "[t]he time difference was the deciding factor for" him and that Petitioner's testimony, which was contradicted by the cellphone records, "hurt him big." (*Id.*)

The same juror further elaborated on his decision to find Petitioner guilty in a later interview with a private investigator, which was submitted below as part of Petitioner's Section 440 proceeding:

[Juror]: . . . I remember the guy was guilty as sin.

[Investigator]: And why do you say that?

[Juror]: Well, if it wasn't enough that the guy was—the kid he shot was pointing a finger at him. He was—the story that he was telling when he took the stand. *He basically got caught in a lie. He was saying, yeah, I was calling myself from home. You know, that's the time I said, you know, why are you calling your house if you're there?*

7

*    *    *    *

[Investigator]: Okay. Was there anything else that stood out or was that the deciding factor[?]

[Juror]: The fact that the kid was pointing a finger at him, and the fact that he was caught lying to me was what decided it for me.

(*Id.* at ECF 72.)

### B. Direct Appeal

Petitioner, represented by counsel,[10] appealed his conviction to the Appellate Division, Second Department ("Appellate Division") on the following five grounds: (1) Petitioner's guilt was not proven beyond a reasonable doubt and the verdict was against the weight of the evidence at trial; (2) the Court erred in holding that Petitioner was not entitled to a *Wade* hearing[11]; (3) Petitioner was denied a fair trial based on the cumulative effect of the prosecutor's improper remarks, which "denigrated the defendant and [his] case" and "unduly inflamed" the jury's emotions; (4) Petitioner's sentence was unduly harsh and excessive; and (5) the Court erred in failing to grant a motion for mistrial upon discovering that two jurors may have viewed a newspaper article about the trial and about Petitioner's prior acquittal from two prior murder charges. (Dkt. 5-2 at ECF 3.)

The Appellate Division affirmed Petitioner's conviction, holding that: (1) Petitioner's challenge to the legal sufficiency of the evidence was unpreserved for appellate review, but that the trial evidence construed in the light most favorable to the prosecution was still legally sufficient

---

[10] Petitioner was represented on his direct appeal by a different attorney than both his trial counsel and current counsel.

[11] A court may conduct an evidentiary hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967) to determine the admissibility of a pre-trial identification. *See United States v. Chandler*, 164 F. Supp. 3d 368, 382 (E.D.N.Y. 2016).

to establish Petitioner's guilt beyond a reasonable doubt and that the verdict was not against the weight of the evidence; (2) the Court did not err in denying Petitioner's request for a *Wade* hearing, given the sufficiency of the record at the *Rodriguez* hearing[12]; (3) Petitioner's contention that the prosecutor's remarks were improper was also unpreserved for appellate review, but the challenged remarks were either fair comment on the evidence, permissive rhetorical comment, or responsive to defense counsel's summation; (4) Petitioner's sentence was not excessive; and (5) Petitioner's contention regarding jury impartiality was without merit. *People v. Garner*, 27 A.D.3d 764 (N.Y. App. Div. 2006). On July 7, 2006, the New York Court of Appeals denied Petitioner's application for leave to appeal. *People v. Garner*, 854 N.E.2d 1283 (N.Y. 2006)

Petitioner then petitioned the Appellate Division for a writ of error *coram nobis*, alleging ineffective assistance of appellate counsel.[13] On February 9, 2010, the Appellate Division found that Petitioner had failed to establish that he was denied effective assistance of appellate counsel and denied Petitioner's application for leave to appeal. *People v. Garner*, 70 A.D.3d 854 (N.Y. App. Div. 2010).

## C.  State Collateral Attacks

Petitioner then filed his Section 440 Motion, alleging ineffective assistance of his trial counsel on eight separate grounds: (1) counsel conceded in opening and summation that the victim, who was the prosecution's key witness, was not lying—despite Garner's conflicting testimony—

---

[12] "In New York, a *Rodriguez* hearing is held in lieu of a *Wade* hearing when the prosecution alleges that, by virtue of a prior relationship between a witness and the defendant, the witness is 'impervious to police suggestion,' and her identification is therefore untainted by an otherwise suggestive pretrial identification procedure." *Stallings v. Woods*, 04-CV-4714, 2006 WL 842380, at *16 n.17 (E.D.N.Y. Mar. 27, 2006) (quoting *People v. Rodriguez*, 593 N.E.2d 268 (N.Y. 1992).

[13] The precise grounds for Petitioner's *coram nobis* petition are not in the record before this Court.

and instead pursued a theory that the witness was delusional; (2) counsel abandoned a hearsay objection to a police officer's restatement of the victim's statements; (3) counsel failed to make or renew a motion to dismiss the indictment after learning that the victim had not testified before the grand jury; (4) counsel misspoke during his opening, thereby conceding a disputed factual matter; (5) counsel failed to impeach the victim and a corroborating witness with prior inconsistent statements; (6) counsel failed to object to unqualified expert testimony regarding the gunshot and, further, failed to use that testimony to the defense's advantage; (7) counsel failed to obtain Garner's cellphone records in order to prepare for trial and refresh Garner's recollection before testifying; and (8) counsel failed to use Garner's cellphone records to defense's advantage by cross-referencing those records with 911 calls and establishing that Garner was continuously using his cellphone throughout the only period of time during which Keith could have been shot.

On October 4, 2010, the County Court of the State of New York for the County of Suffolk ("County Court") denied Petitioner's motion without a hearing. The County Court found that Petitioner's ineffective assistance of counsel claims were, "for the most part, issues that could have been resolved by examining the record and, therefore, should have been determined on direct appeal." (Dkt. 7-3 ("440 Opinion") at ECF 3.) The County Court also denied each of Petitioner's claims on the merits and asserted that trial counsel's actions and decisions were reasonable at trial. (440 Opinion at ECF 3-8.)

### D.    *Habeas* Petition

On January 3, 2011, Petitioner submitted the instant Petition for a Writ of *Habeas* Corpus pursuant to 28 U.S.C. § 2254. (Dkt. 1.) The parties agree that the petition is timely. (Dkt. 5 at ECF 5.)

The Court held an evidentiary hearing on the petition on February 24, 2016, at which Petitioner's trial counsel testified. The Court also heard oral argument from Petitioner's and Respondent's counsel on December 7, 2015 and February 24, 2016.

## DISCUSSION

## I.    PROCEDURAL DEFAULT

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must comply with certain procedural requirements when filing an application for a federal writ of *habeas corpus*. A federal court generally is precluded from reviewing a *habeas* claim if the State court's prior denial of that claim rests on adequate and independent State law grounds. *Lee v. Kemna*, 534 U.S. 362, 375 (2002). A petitioner's failure to comply with a State procedural rule qualifies as such an adequate and independent state ground, provided that (i) the State court actually "relied on the procedural bar as an independent basis for its disposition of the case," *Harris v. Reed*, 489 U.S. 255, 261 (1989) (internal citation and quotation marks omitted), and (ii) the State procedural rule is "firmly established and regularly followed." *See Cotto v. Herbert*, 331 F.3d 217, 239-40 (2d Cir. 2003). In determining whether to deny a *habeas* claim on that basis, however, federal courts "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" *Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir. 2001) (quoting *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000)).

Here, Respondent contends that the County Court's reference to CPL § 440.10(2)(c)—which provides, in relevant part, that a State court must deny a Section 440 Motion when the defendant fails to raise an issue on direct appeal—demonstrates that the County Court's rejection of Petitioner's ineffective assistance claim rested on adequate and independent State grounds. (Dkt. 8 at ECF 23-24.) The Court disagrees for the sole reason that the County Court did not

expressly rule that the entirety of Petitioner's ineffective assistance claim could have been raised on direct appeal. Rather, the County Court stated that Petitioner's "arguments concerning ineffective assistance of counsel are, *for the most part*, issues that could be resolved by examining the record and, therefore should have been determined on direct appeal[.]" (440 Opinion at ECF 3-4 (emphasis added).) It is therefore impossible to determine whether the County Court "clearly and expressly" rested the entirety of its decision regarding Petitioner's ineffective assistance claim on adequate and independent State grounds or which of Petitioner's ineffective assistance arguments the County Court rejected on procedural grounds. Accordingly, the Court declines to find that Petitioner's ineffective assistance claim is procedurally barred for purposes of federal *habeas* review.[14]

## II. MERITS OF PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Having determined that Petitioner's *habeas* petition is not procedurally barred, the Court turns to the merits of his ineffective assistance of counsel claim.

---

[14] *See, e.g.*, *U.S. ex rel. Bell v. Pierson*, 267 F.3d 544, 556 (7th Cir. 2001) (finding claim not procedurally defaulted where lower court expressly referenced procedural bar, but did not discuss how bar applied to the facts and also denied *habeas* relief on the merits); *Devison v. Cunningham*, 09-CIV-1031, 2010 WL 5060789, at *22 (S.D.N.Y. Oct. 15, 2010) (State court decision did not clearly and expressly rely on procedural bar where court merely "adopt[ed]" Respondent's argument), *report and recommendation adopted,* 09-CIV-1031, 2010 WL 5060728 (S.D.N.Y. Dec. 8, 2010); *Alexander v. Connell*, 05-CIV-9020, 2010 WL 2165273, at *9-10 (S.D.N.Y. Apr. 9, 2010) (finding no express reliance where decision stated that petition was either subject to dismissal because it was previously raised or rejected or because it could have been raised on direct appeal), *report and recommendation adopted,* 05-CIV-9020, 2010 WL 2165272 (S.D.N.Y. May 28, 2010); *Santorelli v. Cowhey*, 124 F. Supp. 2d 853, 856 (S.D.N.Y. 2000) (State court did not clearly and expressly rely on procedural bar where it was "at best, ambiguous as to whether it determined that Petitioner's federal constitutional claims . . . had been dismissed because they were unpreserved as a matter of state law or because they lacked merit), *aff'd,* 4 F. App'x 78 (2d Cir. 2001).

## A. AEDPA Legal Standard

A State prisoner seeking *habeas* relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) sets forth the standard of review that applies when a *habeas* claim has been adjudicated on the merits by the State court:[15]

> An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Basing his claim on Section 2254(d)(1), Petitioner argues that the County Court's rejection of his ineffective assistance claim was an unreasonable application of clearly established federal law. (Dkt. 11 at ECF 39.) In deciding this issue, the Court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Even if the Court finds that "the state court's adjudication of the claim was unreasonable under § 2254(d)[,] . . . the court may . . . [only] grant *habeas* relief . . . if the petitioner has shown a violation of federal law under § 2254(a)," *i.e.*, that he "is in custody in violation of the Constitution or laws or treaties of the United States." *Lopez v. Miller*, 906 F. Supp. 2d 42, 50

---

[15] The parties agree that the State court adjudicated Petitioner's ineffective assistance of counsel claim on the merits. (*See* 440 Opinion at ECF 4-9; Dkt. 8 at ECF 12 ("The state courts . . . have decided the federal issues on the merits . . . and the deferential standard of review applies.").)

(E.D.N.Y. 2012); 28 U.S.C. § 2254(a). In making this determination, the Court may consider evidence beyond the State court record including, but not limited to, information obtained at an evidentiary hearing. *Lopez*, 906 F. Supp. 2d at 55-56. Accordingly, to succeed on his ineffective assistance claim, Petitioner must establish that: (1) the County Court's rejection of his ineffective assistance claim was unreasonable under 28 U.S.C. § 2254(d); and (2) his constitutional rights were violated under 28 U.S.C. § 2254(a). The Court finds that Petitioner has established both.

### B.      Section 2254(d)(1): Unreasonable Application of Law

A State court decision is an "unreasonable application" of clearly established federal law if "the [S]tate court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see also Gersten v. Senkowski*, 426 F.3d 588, 606 (2d Cir. 2005). "[A]n unreasonable application of federal law[, however,] is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410. Section 2254 thus embodies a "difficult to meet . . . and highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (internal citations and quotations omitted). "Some increment of incorrectness beyond error is required," but the Second Circuit has cautioned "*that the increment need not be great*; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Monroe v. Kuhlman*, 433 F.3d 236, 246 (2d Cir. 2006) (emphasis added) (internal quotation marks and citations omitted).

The Supreme Court's *Strickland* standard, which governs ineffective assistance claims, is well-established. To prevail on such a claim, a petitioner must demonstrate that (i) his counsel's performance "fell below an objective standard of reasonableness" and (ii) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Notably, the Supreme Court

also observed in *Strickland* that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691; *see also Gersten*, 426 F.3d at 607 ("[C]ounsel has a duty to make reasonable investigations, and a decision not to investigate will be reasonable only to the extent that reasonable professional judgments support the limitations on investigation." (internal quotation marks and citation omitted)).

The Court finds the County Court's decision regarding trial counsel's handling of the cellphone records issue to be an unreasonable application of *Strickland* and its progeny. In rejecting Petitioner's argument that his attorney was ineffective because he failed to obtain the cellphone records before trial, the County Court concluded that this decision was a "reasonable and potentially effective trial strategy," explaining "that, if defendant had reviewed the records ahead of time, this would have been disclosed upon cross-examination," and thus by not getting the records before trial, Petitioner's trial counsel "avoid[ed] any inference that his client's testimony was tailored to conform with information contained within the phone records." (440 Opinion at ECF 8.) This *post hoc* rationalization is so speculative and confounding, not to mention unconvincing, that it rises to the level of being an unreasonable application of *Strickland*. Even though a jury could have drawn a negative inference about Petitioner's credibility based on his having reviewed the cellphone records before testifying—which is far from certain—no reasonable attorney would have concluded that this inference would be more, or even as, damaging to Petitioner's credibility, *as well as* his entire defense, than him being completely blind-sided by the prosecution's use of the cellphone records on cross-examination to thoroughly impeach him and decimate his alibi claim. Moreover, to the extent that avoiding a negative inference regarding Petitioner's credibility was sound trial strategy, the County Court's rationalization does nothing to justify trial counsel's failure to obtain the records and review them *himself*, without showing them

to Petitioner, so that counsel could decide critical trial strategy issues, such as what defense to employ (*e.g.*, whether to argue alibi), whether Petitioner should testify, how to prepare Petitioner to testify (*e.g.*, how the cellphone records could be used against him on cross-examination), and, as discussed below, whether the cellphone records might have actually aided Petitioner's defense. Nor does the County Court's rationalization justify trial counsel's failure to take more time to review the cellphone records after the prosecution revealed prior to trial that they were aware of the records and mid-trial that they possessed and intended to use them on Petitioner's cross-examination. Even a cursory review of the records would have revealed the devastating impact they would have on Petitioner's credibility and alibi defense, which, in turn, should have prompted defense counsel to renew his pre-trial objection to their admission based on the prosecution's failure to turn them over during discovery.

For this reason, and those further explained below, the Court finds that trial counsel's actions "fell below an objective standard of reasonableness" and that the County Court's contrary finding is an unreasonable application of the *Strickland* standard.[16] *See Gersten*, 426 F.3d at 611 (finding counsel's failure to challenge credibility of prosecution witness to "not be based on a sound trial strategy" and therefore "it was an unreasonable application of *Strickland* for the County Court to hold otherwise").[17]

_____

[16] The County Court did not analyze the second prong of *Strickland*—whether trial counsel's failure to obtain Petitioner's cellphone records was prejudicial.

[17] The State court also noted that "Defendant [Garner] concedes that counsel did in fact attempt to obtain the records prior to trial and that the obligation to do so rested with [D]efendant." (440 Opinion at ECF 8.) First, the Court agrees with Petitioner that it is unclear how the State court reached this conclusion. Second, even if this concession was true, it does not excuse Petitioner's trial counsel's failure to obtain the records or later object to their introduction.

### C.  Section 2254(a): Constitutional Violation

Having determined that the County Court unreasonably applied the *Strickland* ineffective assistance standard, the Court must next decide whether Petitioner is "in custody in violation of the Constitution." 28 U.S.C. §2254(a).  In deciding this issue, the Court considers evidence beyond the State court record, including information learned at the February 9, 2016 evidentiary hearing.  *Lopez*, 2012 WL 6027751, at \*1.  Here, the Court must decide the same issue presented to the County Court: whether Garner was denied effective assistance of trial counsel.  Thus, the Court addresses *Strickland*'s two prongs: (1) performance and (2) prejudice.

### 1.  Performance

On the first prong, "the [ ] inquiry must be whether counsel's assistance was reasonable considering all circumstances."  *Strickland*, 466 U.S. at 694.  In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments."  *Rompilla v. Beard*, 545 U.S. 374, 408 (2005) (internal quotation marks and citation omitted).  The Court must not look only to the evidence before counsel but also consider "whether the known evidence would lead a reasonable attorney to investigate further."  *Wiggins v. Smith*, 539 U.S. 510, 527 (2007); *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015).  Thus, the Court's evaluation of this duty does not hinge on whether defense counsel should have presented certain evidence; rather, the inquiry hinges on whether the investigation itself was reasonable.  *Wiggins*, 539 U.S. at 523; *Rivas*, 780 F.3d at 547.  Failing to investigate certain leads can qualify as constitutionally deficient.  *See, e.g.*, *Espinal v. Bennett*, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008), *aff'd,* 342 F. App'x 711, 712 (2d Cir. 2009) (holding that counsel's failure to investigate a redacted police report that could have corroborated petitioner's alibi qualified as constitutionally deficient); *Schulz v. Marshall*, 528 F.Supp.2d 77, 96 (E.D.N.Y. 2007), *aff'd,* 345 F. App'x 627, 627 (2d Cir. 2009) (holding that counsel's failure to call and interview a potential alibi witness qualifies as constitutionally deficient).

Here, trial counsel's performance fell below an objective standard of reasonableness. In reaching this conclusion, the Court finds *United States v. Velazquez* to be instructive. In *Velazquez*, a jury convicted the defendant of five crimes related to his participation in a conspiracy to rob drug traffickers and business owners. *United States v. Velazquez*, 11-CR-639, 2016 WL 3561704, at *1 (E.D.N.Y. June 24, 2016). After his conviction, the defendant moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 arguing, among other things, that his trial counsel was ineffective. *Id.* at *1. The Court granted the defendant's motion, concluding that defense counsel's errors satisfied both *Strickland* prongs. In particular, the Court found it inexcusable that defense counsel failed to obtain and introduce the defendant's cellphone records, and rejected counsel's explanation that he did not do so because "such records would be useless given that the records would not confirm that it was the defendant (as opposed to someone else) using the telephone at any particular time." *Id.* at *2. The Court explained that there was "no downside to obtaining and reviewing the records" and that "[e]ven though telephone records do not establish on their face who was using the phone at a given time, the records can often be used . . . to strongly support the conclusion that it was the defendant . . . who was using the telephone at the relevant times." *Id.* The Court also found that defense counsel erred by failing to show his client certain Department of Motor Vehicle records prior to their introduction, where it was "clear that, if the defendant had been shown [the records] prior to trial and had time to discuss it with his attorney, counsel would have been able to obtain [] evidence that would have definitely undermined the government's theory." *Id.* at *2-3.[18]

---

[18] The Court identified a third error—defense counsel's entering into a stipulation that was damaging to defendant—which, when combined with the previously discussed errors, "in the aggregate," satisfied the first prong of *Strickland*. *Id.*

The reasoning in *Velazquez* is persuasive here. Trial counsel's failure to obtain Petitioner's cellphone records before trial was inexcusable and devastating to Petitioner's defense. Not only did it lead to Petitioner's impeachment on cross-examination by documents he had not previously seen, but it also prevented trial counsel from devising a reasonable trial strategy and pursuing other leads, such as identifying the people whom Petitioner had spoken to on the phone during critical times on the night of the shooting. Indeed, Petitioner's counsel acknowledged as much during the February 24 evidentiary hearing:

> Q: And for what reason would you want to know in advance [what cellphone records the State has]?
>
> A: To review, see what phone calls were being made, see who the individual called, see if there's any calls to the complaining witness in this case or the victim or his friends. *It would be foolish not to.*

(Dkt. 29 at 21:22-22:2 (emphasis added).)[19]

The Court cannot envision any reason for Petitioner's counsel not to have obtained the cellphone records prior to trial, or to request a recess when it became clear that the prosecution was going to have the records admitted and use them to cross-examine Petitioner. At the February 24 hearing, trial counsel suggested reasons why he did not obtain the Nextel records, including his belief that Petitioner primarily used "prepaid" and "burn[er]" cellphones, for which there would be no call activity records, that he believed Petitioner primarily used his Nextel cellphone for point-to-point communication, similar to a walkie-talkie, which would also not be reflected in call activity records, and that Petitioner did not advise or lead his attorney to believe that there would

---

[19] Though he did not have a clear memory of the events relating to Petitioner's case, trial counsel appeared to the Court to be candid and forthcoming during his testimony at the hearing, and the Court credits his testimony.

be anything useful to his case from any of Petitioner's cellphones. (Dkt. 29 at ECF 16, 19.)[20] However, any confusion surrounding Petitioner's cellphones or counsel's assumptions about Petitioner's cellphone usage did not absolve the attorney of his duty to conduct a reasonable investigation to identify all evidence that might have helped or hurt Petitioner's case, especially when counsel clearly knew, or had reason to believe, that Petitioner had used his Nextel cellphone the night of shooting. (Tr. at 512-13 (shortly after the shooting, victim received a call from Petitioner, which appeared on the Caller ID as Petitioner's nickname).) Similarly, even if Petitioner did not ask his attorney to obtain the cellphone records,[21] it was the attorney's responsibility to determine their relevance, if any, regardless of the client's failure to recognize it. Here, the potential relevance of the cellphone records was obvious: Petitioner was pursuing an alibi defense and thus his whereabouts and activity at and around the time of the shooting—which could be demonstrated, in part, through Petitioner's cellphone calls—was of critical significance. Yet, despite initially seeming to understand the need to obtain the cellphone records, Petitioner's counsel seemingly delegated the responsibility for getting them to Petitioner's mother and ultimately did not wait to receive them before proceeding to trial.[22]

Furthermore, even if trial counsel's failure to obtain the cellphone records prior to trial was excusable, no reasonable attorney would have proceeded with trial after it became obvious that

---

[20] Petitioner's counsel did acknowledge that he did not have a "clear recollection either way [as to] whether or not [Petitioner] asked [him] to get [Petitioner's] cell phone records." (Dkt. 29 at ECF 18.)

[21] At the hearing, Petitioner's counsel denied Petitioner's assertion that he had asked his attorney to obtain the cellphone records. (Dkt. 29 at 16:6-12.)

[22] In conflict with her son's testimony, Petitioner's mother testified that *Petitioner* asked her to obtain his cellphone records—not Petitioner's trial counsel. (Dkt. 29 at ECF 7.) In any event, it is clear that, prior to trial, Petitioner's counsel was well aware of the existence and potential significance of the cellphone records.

those records—which trial counsel himself had not seen—could be used against his client during cross-examination. Despite objecting at the pre-trial conference to the prosecution's introduction of the records—which the prosecution claimed not to have at that time—trial counsel dropped his objection when the prosecution agreed not to use them in its case in chief.[23] But, when the prosecution suddenly sought to spring the records on the defense in the middle of trial and only after Petitioner's direct testimony, his attorney failed to renew his objection to their admission, despite having previously objected to their admission precisely because they had not been provided to the defense. To make matters worse, trial counsel only briefly reviewed the cellphone records— if at all—before consenting to their admission and use during Petitioner's cross-examination. Trial counsel's mistakes led to the impeachment of his client and the destruction of Petitioner's entire alibi defense. Furthermore, by not objecting to the admission of the cellphone records, Petitioner's counsel likely precluded the possibility of obtaining post-trial relief on that issue. *See People v. Oliphant*, 986 N.Y.S.2d 600, 601 (N.Y. App. Div. 2014) (finding that "defendant's argument that the court erred in admitting a recording of two 911 emergency telephone calls placed by the complainant regarding the subject incident [was] unpreserved for appellate review, as the defendant failed to object to the admission of the recording at trial").

Thus, trial counsel's failure to obtain Petitioner's cellphone records and also his failure to object to their surprise admission mid-trial constituted deficient performance.

### 2. Prejudice

With respect to the second prong, Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

[23] To the extent trial counsel implicitly consented to the prosecution's use of the cellphone records for cross-examination purposes, without ever having seen them, this was clearly ineffective as well.

been different." *Strickland*, 466 U.S. at 694. "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695. "Indeed, the defendant must show more than that the unprofessional performance merely had some conceivable effect." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal citation and quotation marks omitted). But, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a preponderance* of the evidence to have determined the outcome." *Id.* at 64 (quoting *Strickland*, 466 U.S. at 694) (emphasis in original). This inquiry requires an evaluation of trial counsel's failure within the context of the State's case and the evidence supporting Petitioner's conviction. *See Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001). "The Supreme Court has made clear that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *Schulz v. Marshall*, 528 F. Supp. 2d 77, 100 (E.D.N.Y. 2007) (quoting *Strickland*, 466 U.S. at 696).

Applying the standard here, the Court "cannot conclude that there is no reasonable probability" that the failure to obtain Petitioner's cellphone records "affected the outcome of [Petitioner's] trial." *Henry*, 409 F.3d at 66. As trial counsel himself acknowledged, it is conceivable that he would have pursued a different strategy had he reviewed the records:

> The Court: Had you had the phone records that you now see before the trial started, would that have changed your strategy?
>
> [Trial Counsel]: It may have.
>
> The Court: In what way?
>
> [Trial Counsel]: Well, I think in speaking with Blair and redefining where he may have been, and based on our conversations as to other witnesses that may be able to testify, for example, that Blair was home or was not home . . . .

The Court: Or who he was talking to on the phone?

[Trial Counsel]: Correct, and times.

(Dkt. 29 at 46:9-20.)  Trial counsel also conceded that a review of the cellphone records might have led him to not call Petitioner to the stand.  (*Id.* at 47:1-4.)

Indeed, the devastating impact of the prosecution's use of the cellphone records to cross-examined Petitioner is borne out by the one juror's statements to the media and a private investigator after the trial:  "[Petitioner] was guilty as sin" because he "basically got caught in a lie" when "[h]e was saying, yeah, I was calling myself from home.  You know that's the time I said, you know why are you calling your house if you're there [*i.e.*, at your house]? . . . . [T]he fact that he was caught lying to me was what decided it for me."  (Dkt. 10-2 at ECF 72, 77.)  Thus, the prosecution's introduction and use of Petitioner's cellphone records had an undeniable impact on the verdict.

Had Petitioner's counsel obtained and reviewed the records before trial, it is likely he would have made different strategic decisions—as he acknowledged at the February 24 hearing— that would have avoided or mitigated the potentially negative impact of the records, such as not asserting an alibi defense and not having Petitioner testify.[24]  Even if Petitioner had still chosen to

---

[24] This is not to say that Petitioner necessarily could have avoided testifying, even if he knew about the cellphone records before trial, given that some of the evidence required explanation that only Petitioner could give, *e.g.*, the presence of Keith's money in the glove compartment of Petitioner's car.  In addition, even if Petitioner chose not to testify, his post-arrest claim to the police about being at home at the time of the shooting—which was arguably contradicted by the cellphone records—might have been introduced by the prosecution as a false exculpatory statement.  *United States v. Taylor*, 767 F. Supp. 2d 428, 434 (S.D.N.Y. 2010) ("[F]alse exculpatory statements are admissible as circumstantial evidence of a consciousness of guilt in this Circuit.").  Petitioner therefore might still have chosen to testify in order to explain how his alibi claim was not contradicted by the cellphone records.  In any event, in making these and other consequential decisions regarding his defense, Petitioner should have had the benefit of this extremely relevant information, of which his counsel was fully aware before trial.

testify, he and his attorney would have had the benefit of the cellphone records to prepare him to testify and to anticipate questions about the calls to his home around the time of the murder.[25] Such changes in strategy clearly could have affected the outcome of Petitioner's trial, especially given that the State's case came down to a credibility contest between Petitioner and Keith. There was no forensic evidence or an eyewitness identification establishing that Petitioner was the shooter.[26] As the one juror confirmed, it was Petitioner's impeachment coupled with Keith's testimony that led to Petitioner's conviction. Thus, had Petitioner not been impeached, the jury could have credited his testimony over Keith's, and acquitted him.

However, given the difficulty of reconciling Petitioner's alibi defense and testimony with the cellphone records, it is more likely that Petitioner would not have pursued an alibi defense and would not have testified, leaving the jury to decide the case based almost exclusively on Keith's and Merkelson's testimony. Were this the only likely scenario, the Court would not find a "reasonable probability" that the outcome of the trial would have been different.

---

[25] While a defendant does not have a "right" to falsely tailor his testimony to other evidence in the case, it is entirely proper for an attorney to rely on other evidence in preparing his client to testify, whether to jog the client's memory or verify its accuracy, especially with respect to the specific timing of events. Here, given the inexact time frames involved, it is conceivable that the cellphone records might have prompted Petitioner to remember more precisely his whereabouts at different times that night and where he might have been when he called his home. In any event, the fundamental point is that a defense attorney has a duty to obtain all evidence relevant to his client's case so as to be able to adequately and appropriately prepare his client's defense.

[26] Keith, of course, testified that he was shot from behind while walking a few feet in front of Petitioner, who was the only other person present at the time. Though there was other evidence pointing to Petitioner's guilt, as discussed *supra* in footnote 24, the Court does not find that the prosecution's case was so overwhelming as to negate the reasonable probability that Petitioner could have been acquitted if his attorney had obtained the cellphone records before the trial and investigated and prepared Petitioner's defense using that information. *See Salcedo v. Artuz*, 107 F. Supp. 2d 405, 418 (S.D.N.Y. 2000) ("Given the overwhelming evidence of petitioner's guilt, he has failed to [demonstrate prejudice].").

But, as shown in the instant *habeas* petition and at the February 24 hearing, Petitioner's counsel could have used the cellphone records at trial to affirmatively establish, at a minimum, reasonable doubt as to Petitioner's commission of the crime. Specifically, he could have argued that based on the 911 calls to the police on April 13, 2002, the shooting occurred between 10:31 p.m. and 10:41 p.m.,[27] and that, given this time frame, the cellphone records create reasonable doubt as to whether Petitioner was even with Keith when he was shot—as Keith claimed and Petitioner denied. Petitioner's cellphone records establish that Petitioner was on the phone *continuously* between 10:28 p.m. and 10:41 p.m., *i.e.*, the entire ten-minute window during which Keith was shot. As set forth in Petitioner's Reply Brief (Dkt. 11 at ECF 26), Petitioner's cellphone records show that Petitioner made the following calls the night of April 12, 2002:[28]

| Time of Call | Duration of Call (minutes:seconds) |
| --- | --- |
| 10:28 p.m.[29] | 2:04 |

---

[27] Although the exact times of the 911 calls are not in the record, the Court credits Petitioner's argument that approximate times can be discerned based on the submitted evidence. In particular, a minute-and-a-half into the first 911 call, the operator told the caller that police were already on the way. Since Officer Gover received notification to respond to the shooting at 10:44 p.m., the call could not have occurred prior to 10:41 p.m. On the second 911 call, the caller indicated that the shooting happened five to ten minutes prior to her call. Crediting that estimation, and assuming the call occurred ten minutes before, then the shooting could not have occurred any earlier than 10:31 p.m.

[28] Notably, Respondent does not dispute that these cellphone records are Petitioner's. Indeed, at trial, the prosecution, after impeaching Petitioner with the records, argued in closing both that the cellphone was Petitioner's and that he was the person using the cellphone that night, at least at the time the calls to his home were made.

[29] Two of these calls, the one at 10:28 p.m. and 10:31 p.m., were to Petitioner's home (Dkt. 11 at 22), which would tend to undermine his claim of having gone home and remained there after meeting Keith and Merkelson at the McDonald's. However, as previously discussed, had Petitioner's counsel obtained the cellphone records in advance of trial, he could have used them to determine more precisely Petitioner's whereabouts at different points in time on the night of the shooting. Furthermore, even if these records might have undercut Petitioner's credibility and any claim about him being at home at the time of shooting, the records would have directly raised

| | |
|---|---|
| 10:31 p.m. | 1:00 |
| 10:32 p.m. | 2:15 |
| 10:35 p.m. | 4:38 |
| 10:40 p.m. | 1:06 |

This evidence would have been critical to Petitioner's defense because (1) a jury certainly would have reason to doubt that Petitioner was shooting Keith while simultaneously making a phone call, or in the midst of making a series of phone calls, and (2) these records contradict Keith's testimony that Petitioner did not make any calls during their 20-minute ride to the drug location or thereafter, which would undercut both Keith's credibility and his account of the shooting.[30]

Considering the totality of these facts, the Court finds that there is a reasonable probability that the outcome of the trial would have been different had Petitioner's counsel obtained and reviewed the cellphone records before trial, conducted investigation based on these records, and formulated a trial strategy that both took into account and affirmatively used the records in Petitioner's defense. Accordingly, the Court finds that Petitioner's Sixth Amendment right to the effective assistance of counsel at trial was violated.

---

significant doubt about whether Petitioner shot Keith, which was the ultimate issue the jury had to decide.

[30] It is clear from the record that Petitioner's counsel never analyzed the 911 calls to determine the likely time frame for the shooting. In fact, in his closing, notwithstanding the evidence that Gover was notified of the 911 at 10:44 p.m., counsel mistakenly referred to the shooting taking place around 10:52 p.m. Given defense counsel's failure to identify the time frame for the shooting, it is unclear that even if he had timely obtained or received the cellphone records, he would have appreciated their significance. What is clear, however, is that after receiving them mid-trial, he did not.

## CONCLUSION

For the reasons set forth above, the Court concludes that the State court's decision to deny Petitioner's ineffective assistance claim under *Strickland* "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Moreover, the Court finds that Petitioner has shown that his counsel's performance fell "outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 690.

Accordingly, Petitioner's *habeas* petition is GRANTED. Respondent is ordered to release Petitioner from custody within forty-five (45) days of this Order unless the State declares its intention, before those forty-five (45) days expire, to retry Petitioner on the charges against him. Should Respondent choose to appeal this decision, it shall advise the Court whether it is seeking to stay this decision pending appeal.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: December 13, 2016
           Brooklyn, New York